Mr. Sockett, I think you may have left your mask up here. Oh, thank you, Your Honor. All right. Our second case for this morning is United States v. Bell. And I believe counsel for the appellants, Mr. Kelleher, is, I see him on the Zoom, and counsel for the government is here. So, Mr. Kelleher, we are ready for you to proceed. Thank you, Your Honor. Good morning. Christopher Kelleher for the appellant. The expression, this case is unique, is every lawyer's famous last words. Cliché aside, it fits here. What happened wasn't just unique, but unprecedented. More to the point, it was ineffective assistance of counsel. Working for one defendant to get information from another, and then defecting hours later, epitomizes conflicted and ineffective assistance. So, Mr. Kelleher, let me tell you right away one thing that troubles me about this argument. And that is that the record, as it comes to us, seems to be devoid of content about what was discussed between Mr. Joyce and Mr. Bell, or for that matter, Mr. Joyce and Attorney Eliadis, and the co-defendant, Reyes. So, I'm not sure that this is the right time to look at this, because with no information, what are we supposed to assume? We're supposed to assume the worst? To some degree, yes, Your Honor. But I would point to the transcript, obviously, docket 266. It's 147 pages. The district court, in the district court's defense, goes through a full colloquy of everything that happened, warts and all. And I think here, admittedly, we don't know precisely what was said between Eliadis and Joyce and Bell. There is enough here, given this extreme situation, that Joyce was wearing two hats simultaneously and unbeknownst to each defendant. So, I think the rareness of this situation is what compels an ineffectiveness argument at this stage. Even if we stick with, I mean, Joyce, of course, changes his story here and there. But even if we stick with his account, and you're right, I think the district judge was quite conscientious trying to get to the bottom of this. And I'm also just on the side going to comment that Mr. Bell does not seem to have been the easiest person to work with. But that said, when he says he's received confidential information about Reyes' defense while working with Eliadis, you know, what does that mean? I mean, I don't know how you can assess the severity of the conflict or the like. We don't know if this is confidential information that was harmful to Bell or whether it was confidential information that would have had an impact on somebody else's case. I don't know, because the record doesn't tell us. Certainly, Judge Wood. But I would also point to the waiver itself, which Joyce filed. Incidentally, he drafted and filed for Mr. Bell two days following the hearing. And that's docket 259, I believe. And there he says that he did work for, as part of the waiver, Bell acknowledges that Joyce worked for Reyes. Now, granted, I admit that this was not, you know, six months of working, you know, hand in hand with Eliadis. It was very limited interaction, but it was enough. And the fact that it was the weekend before trial, obviously, you know, the weekend before trial, it's very harried and very stressful and it's very directed at getting the trial prepared. So there was certainly case strategy that was discussed between the two attorneys. And again, I recognize that direct appeals are not usually the best vehicle to bring such claims. If I were Judge Easterbrook, which I am not, but he, when I was sitting with him very recently, reminded a different lawyer that across the history of the Seventh Circuit, all the way back to 1891, no one has actually succeeded on direct appeal in getting an ineffectiveness of counsel argument accepted. Because the record is usually a mess, I mean, or nonexistent, it's not really even a mess. But let me push beyond that and ask you why this case, in your view, seems to fall in the category of conflicts that can't be waived. Because the district court judge also went through a very careful process with Mr. Bell. She had a couple of problems with Mr. Joyce. A, there's the problem that you're talking about. B, there's the problem that he seemed to be absolutely inexperienced, fresh out of law school. And she wanted to make sure that Mr. Bell was conscious of the dice he was rolling, so to speak. And he says, I've thought about it. I want Joyce. I get it. There's a conflict. He says everything you could say. He signs it in writing. Why doesn't that fix things? First of all, Judge Wood, I listened to that argument, and when I heard Judge Easterbrook, I was chilled listening to that. So I recognize the odds are heavily against me. To answer your question, I think, again, I want to try and take off the table any attacks or challenges to what the district court did, as far as its colloquy did. I agree wholeheartedly, and I pointed this out in the letter yesterday to the court. The judge did nothing wrong in terms of her inquiry. Where she went wrong, or ultimately went wrong, was she didn't pull the trigger. She didn't disqualify Mr. Joyce. And the reason, again, to directly answer your question, is there's a violation of rules, professional rules 1.7 and 1.9, which the district court acknowledged. And this court, in turn, recognized that an ethical violation, quote, obviously qualifies as an actual conflict. So the district court's finding of three ethics violations here implicates the Supreme Court's decision in Wheat. And in Wheat, the Supreme Court stated that an actual conflict, or even a serious potential for conflict, will overcome the defendant's right to counsel of choice regardless of waiver. So this combination, this interplay between Turner and Wheat is what compels reversal here. And it's very notable that the prosecution, although Wheat and Turner are fatal to its case, it doesn't touch them. Now, it cites them for black letter law principles and on peripheral points, but it doesn't get to the heart of what those two cases say and why those two cases are so applicable here. So again, I don't want to challenge, and I'm not trying to make an issue of the district court's inquiry at all, where I think the district court went wrong. And again, this was certainly a situation, a mess not of her making or the prosecution for that matter. And she was put in between a rock and a hard place. But that rock and hard place also exists with regard to choice of counsel. One has the feeling that if she had permitted, if she had overridden, I should say, Mr. Bell's preference and said, I'm not going to let you select Joyce to be your lawyer, you would be here on appeal saying that he didn't get counsel of choice. Instead, she does, with a lot of warnings and a lot of reluctance, she does allow him to do this. Again, not really knowing what the full nature of the conflict is. And so here we are saying that she should have disqualified Joyce. I don't, she could rightly have seen herself as on a knife's edge. She was. And to be completely candid, Judge Wood, I would be arguing just as strongly as you. If she had ruled in the opposite. And I would be doing a disservice to Mr. Bell if I wasn't. But I think my position, if I can condition that answer, my position in that regard, if she had overruled his decision, I would be arguing in the face of Bull Pendesco, of Turner, of Wheat, of Holloway. So my argument, if that was the issue, would certainly be more difficult. And so the flip side here is, well, the prosecution now has to explain how this decision dovetails with Turner, and Bull Pendesco, and Holloway, and Wheat. And with all due respect to the prosecution, they have not done that here. We'd be delighted to ask them, though, when they come up. Thank you. And as far as what the prosecution dwells on, it dwells on the lack of a retainer agreement. Or an appearance. This argument need not detain the court long, because there's no authority for that proposition. And moreover, this prosecution takes essentially a hyper-technical approach, which is anachronistic given the realities of the modern-day legal profession. Counsel work with other counsel all the time. Should there be a retainer agreement? Certainly. That would be best practices, but it's not always followed that way. So I think the prosecution is barking up the wrong tree on that. As to Bell's waiver of the conflict, the prosecution fixes its eye on the silver lining and ignores the cloud. According to the prosecution, waiver is the cure-all. But that's just not so. There's precedent, there's professional rules of responsibility, and even common sense, I suggest, would stand counter to the prosecution's position. This is a somewhat different question. There's an internal dispute of fact coming from Mr. Joyce. So during the August 15 hearing, he says that he first met with Bell on behalf of Reyes, so he's trying to help develop Reyes's case. But a little later, he denies that that's what happened. And Reyes's lawyer, then Eliottis, also denies it. So did the district judge need to resolve that factual dispute? And wouldn't it make a big difference? Certainly, Your Honor. She should have. That was another misstep. Again, I know this. Everything was on the fly. Things were in a state of flux. But if I can point this out, and Your Honor raises a good point, if we take Joyce at his word after the recess, after the break in which Eliottis, frankly, got a chance to huddle with her friend Joyce and try to minimize the fallout, if we take Joyce's post-recess testimony at its word, we've got seven pages of transcripts. And it's docket 266, pages 54 to 61. Seven pages of transcripts where Joyce lied. How do we know he's lying? Well, he's saying with specificity. I met with Eliottis. We had coffee. He changes it later. We had lunch. She told me X, Y, Z. Very, very specific. Very specific. And then afterwards, after the break, after the district court scrutiny, it's much more vague. And at page 63, he states, quote, I wanted to go see Belle before I could commit to help Eliottis on her case. So he's even saying that he went to see Belle to see if he could represent Reyes. It makes no sense. It makes no sense that he needs to go see someone else before he can decide to represent another person. He didn't even meet Reyes, but he has to go meet Belle to represent. So it's just, again, I take no joy in denigrating another attorney, but there's just too many half-truths. And a half-truth, frankly, is a whole lie. And we're left here with a mess again. I respect the district court. I respect the prosecution. They're defending something that they didn't create. But again, at the end of the day, this was an unwaverable conflict. Mr. Joyce, he had a foot in each camp, and he simply couldn't represent Belle when he had to worry about any evidence, any testimony, any question, which would frame his former client in a negative light. He had an ongoing duty throughout the trial, an ongoing duty and obligation to protect Mr. Reyes while he represented Mr. Belle. Okay, if you'd like to say something. That would be fine. Thank you, Judge Brewer. Thank you. Mr. Appleby-Battacargi. Good morning, and may it please the Court. Suresh Appleby-Battacargi, appearing for the United States. I'd like to start by addressing defendant's contention that the prosecution fails to address Wheat, and that Wheat is fatal to the prosecution's position. What Wheat sets forth is a permissive disqualification standard. Wheat recognizes that when faced with a knowing and intelligent waiver of the right to conflict-free counsel, there are circumstances in which a district court may, not must, overcome that waiver. And the narrow question presented in this appeal is whether the district court committed a clear or obvious Sixth Amendment error in accepting this defendant's waiver of his right to conflict-free counsel. I'd start with this Court's recent decision in Vizcarra, which was the subject of the government's supplemental authorities letter filed yesterday, which affirmed a district court's broad discretion to accept conflict waivers. Vizcarra also held that a district court's obligation before accepting such a waiver is simply to ensure that a defendant knows what's at stake, what the risks are, and what the defendant is giving up. Mr. Kelleher stated that Joyce was wearing two hats unbeknownst to the defendants. That's simply not an assertion that can be squared with the factual record here. The fact is that whatever potential conflicts Joyce's representation may have created here, the defendant was aware of them, he was expressly advised of them, and he waived those conflicts. Do you think it makes any difference whether we know what was actually said or shared between Joyce and Reyes or Joyce and Bell? In this circumstance, I do not believe it does because there was no actual conflict of interest that materialized by the time we got to trial. Was the government ever planning on calling Reyes as a witness? No, Your Honor. These co-defendants were not tried together. Reyes, in fact, pleaded guilty not with any cooperation agreement. He just pleaded guilty represented by a different lawyer than Eliade's before Defendant Bell ever went to trial. But you weren't planning on calling him in Bell's trial? No, Your Honor. Neither defendant here, neither co-defendant cooperated against the other. Neither was poised to provide testimony against the other. And I think the question of actual conflicts, the seriousness of the conflicts, really depends on the time that these individuals went to trial. Here, this conflict hearing happened in August 2016, the day that a jury was waiting downstairs waiting to be impaneled. And if the district court had accepted this conflict waiver, if the composition of the case was such that Joyce was representing Bell, Eliade's was continuing to represent Reyes, those defendants were tried together, we may have a different scenario. We may have a better argument that there was an actual or very serious conflict of interest presented. But what happened here? Here we're talking about potential conflicts that could have ripened into actual conflicts or potential conflicts that could have dissipated entirely. For example, when the co-defendant who was potentially jointly represented by the same counsel actually pleaded guilty before trial leaving only the question of Bell's guilt and co-defendant Hernandez's guilt and there's no suggestion here  had any conflict of interest with each other let alone one created by Joyce's representation. So there is no clear or obvious Sixth Amendment error here by virtue of the district court accepting a knowing and intelligent waiver and what the defendant advocates for here while conceding that the district court's colloquy was above board, that the district court's colloquy in fact was extraordinarily thorough and the district court was doing everything it possibly could in good faith to advise defendant Bell of the risks associated with Joyce's representation. What the defense is arguing for here is that the district court is obligated to disqualify Joyce that there is some kind of mandatory disqualification rule. I wonder, counsel, if that might be the difference between this case and Vizcarra-Millan because Vizcarra-Millan, that record is one in which it's charitable to say the defendant was very equivocal with regard to who the lawyer should be,  Here, the activity is very much centered on Joyce in the lawyer's actions versus the defendant's equivocation as to who the lawyer should be. Isn't that a distinguishing characteristic between those two cases and might that therefore inform the question of why the district court should or should not have accepted the waiver? Yes, Your Honor. The key difference with Vizcarra-Millan versus this case is in Vizcarra-Millan there was an initial waiver that the defendant tried to claw back claiming at some point these potential conflicts would turn into actual conflicts and therefore I no longer want this person to be my trial counsel. And in Vizcarra this court held the defendant to his initial waiver because it was knowingly and intelligently made. The district court's decision that defendants attempt to later claw back his waiver to gain some kind of tactical advantage was held not to be an abuse of discretion. Here, defendant's waiver was far clearer and persistent in a way that it wasn't in Vizcarra-Millan. It remained resolute. Tell me whatever you want in terms of risks. Tell me whatever you want in terms of potential breaches of ethical conduct and the rules of professional conduct. Whatever you're going to tell me about Joyce and Eliade's meeting together some month and a half before trial to discuss something about Carlos Reyes' case. I have all that information, Your Honor. I have all the information that you have given me, Judge Kendall, that the independent panel counsel that you appointed for the sole purpose of this hearing has given me. I'm aware of all of these advisements and I persist in my choice of Joyce as my counsel. That has to mean something. That has to mean something particularly under plain error review, particularly when even if defendant establishes a clear or obvious Sixth Amendment error, which he hasn't, even if defendant establishes prejudice, which he hasn't, this court's decision to reverse any error would be a discretionary decision on the integrity of the judicial proceedings. So what about, I mean, Judge Kendall does flag that she thinks Joyce violated a number of the rules of professional conduct that govern, I mean, it's basically the Illinois rules that govern in the district court. Your Honor, again, I think these fall within potential violations, not actual violations, especially in light of the vagueness of the record here. At one point, Joyce does say he apparently solicited Melvin Bell as a client. He later claused that assertion back. He does a lot of that, actually. He does a lot of that. I agree, Your Honor, and I'm not here to defend Joyce's conduct. What I am here to defend is the district court's decision to accept a knowing and intelligent waiver of the right to conflict-free counsel. The government believes that defendant's position here in terms of establishing clear or obvious error is fatally undermined by two cases. One is the Turner decision, the Supreme Court's 2010 decision, which held not only that there is no per se rule against joint representation, but that reflexive disqualification decisions based on potential conflicts of interest amount to reversible error, that those amount to structural error in light of what the Supreme Court held in Gonzales-Lopez. The district court here did not engage in a reflexive disqualification decision. You're talking about Turner 1? Turner 1, yes, Your Honor. 2010 Turner case. It was a reflexive disqualification decision. It followed what Flores 1 teaches, the 1993 Flores case, which is that when faced with a knowing and intelligent waiver of the right to conflict-free counsel, courts need not second-guess those waivers, need not question the wisdom of those waivers as long as they are knowingly and intelligently waived, and that's precisely the principle that this court reaffirmed recently in Vizcarra-Milan. In Vizcarra-Milan, Mr. Joyce was, quote, up to his elbows in conflicts, and even then this court affirmed the district court's decision to accept the conflict waiver. Here when presented, as Vizcarra-Milan recognized and as Mr. Kelleher rightfully notes, whichever way the district court would have ruled here, it would have been whipsawed by assertions of error. If the district court had disqualified Mr. Joyce, we would be standing here on a claim of actual structural error, let alone a clear or obvious Sixth Amendment error, and because the defendant entered his waiver of his right to conflict-free counsel knowingly, intelligently, voluntarily, it has to have some consequence here, and more to the point, the district court did not err in accepting that conflict waiver, particularly where on this record those potential conflicts never materialized into actual conflicts, and I want to stress that point. So would it be different if the district court all of a sudden had an epiphany and decided to use Mr. Reyes somehow in the trial? I think that question, Your Honor, would have merited perhaps another hearing, another conflict colloquy, and further development of the record to see if that potential conflict had now materialized into an actual one. It hadn't, and it couldn't where Codefendant Reyes and Codefendant Bell, the defendant here, were never tried together, and that I think is what is fatal generally speaking, but especially applied on the facts of this case. If the court doesn't have any further questions on the Sixth Amendment issue, defendant does raise other questions regarding the admission of evidence, the sufficiency of the evidence, and an instructional error claim. I'd like, with what time remains, to briefly discuss the 404B issue. That's fine. The $100,000 check, you mean? Yes, Your Honor. The district court here decided that the fraudulent treasury check was direct evidence of the scheme, and here I think it's important to note what the evidence was that the jury received and what the evidence wasn't. The evidence that the jury received was a bank exhibit, Chase Bank Records, in which one page of those records was a $100,000 check that purported to be a treasury check. The jury also received the party's agreed stipulation characterizing that check as a fraudulent treasury check. You decided to call it phony, and you're saying that's a synonym? In rebuttal, that's right. That's a comment that was made in rebuttal, and one thing I would emphasize, Your Honor, is that in his reply brief, it appears that Mr. Kelleher is waiving any argument that the rebuttal argument was wrong or that the district court had an obligation to correct the rebuttal argument without any objection. So I want to focus on that forged check, that Defendant Melvin Bell was the one who forged this check, or even that Defendant Melvin Bell was the one who deposited this check. All that was presented to the jury was a bank exhibit purporting to show that at some point Washington National Trust had a deposit for $100,000 and the government providing additional contextualizing evidence that that was not real money. What's the line you're trying to draw between forged and fake? Well, I think that the language matters here. That was actually presented to the jury that saying that it was forged and then arguing a propensity inference that because Defendant Bell created a forged check, deposited a forged check, therefore he must be guilty of this separate fraudulent crime. That propensity inference certainly was never argued. And the foundational basis for that argument didn't even exist because nobody called this a forged check and nobody even identified Defendant Bell as the one who deposited this check. And so the district court was aware of all this when it admitted the check as direct evidence of the scheme. And this was a scheme to defraud that, among other things, was predicated on the material misrepresentation that Washington National Trust was a liquid entity that had money capable of buying mortgages outright, which it would then sell back to these homeowner victims whose check was part of the government's proof that Washington National Trust was not in fact a liquid entity, that it never had sufficient money to buy out a single mortgage. And as the government notes... And in fact it never did, right? And it never did. That's exactly right, Your Honor. And even if the district court's decision here were deemed an abuse of discretion, which I don't think it can be here, even if the check were improvidently admitted, the conviction is still saved under harmless error review and stipulation in the course of a week-long trial. And, Your Honor, I've spent more time talking about this check at oral argument today than the entirety of the evidence presented to the jury about it. This case was not about forged checks. It was not really about this treasury check at all. It was about Washington National Trust being a fraudulent business that built homeowners out of their hard-earned money. The evidence that the jury heard, and that was stressed by the government, was the harrowing testimony of IDFPR regulators who talked about interactions that they had with defendants who held themselves out as the person in charge of the trust and as the person who claimed that he was not subject to IDFPR's regulation. So just out of curiosity, can you explain to me, I think I've seen other cases like this, what the point of this Native American link is for this Washington National Trust that's supposedly a Native American link? That is part of what the defendant and his co-defendants claimed to victims. That there were wealthy Native American backers, millionaires and billionaires who were bankrolling this essentially charitable enterprise of finding distressed homeowners, saving their homes from their allegedly predatory lenders, so that Washington National Trust using these funds could swoop in and save the day. That was all phony. It was all false, it was all false. I see that I'm about to run out of my time. Because there was no Sixth Amendment error, because there was no evidentiary error, because sufficient evidence supported the verdicts, and because there was no instructional error, the government respectfully requests that the court affirm the judgment below. Thank you. All right, thank you very much. Mr. Kelleher, anything further? Yes, Your Honor, very briefly. Firstly, the district court did find three actual ethical violations. Secondly, the prosecution suggests that the right to counsel of choice is untouchable. This right, important as it is, is not absolute. It's not like the right to counsel, it's not like the right to self-representation. Thirdly, waiver isn't the panacea the prosecution portrays, because waiver doesn't end the inquiry. There's an independent interest in the integrity of the proceedings. Indeed, that integrity is ultimately paramount, and it was rendered a sham here. Again, the optics are horrible. Counsel using one defendant to help another, and then immediately thereafter switching sides, just hours before trial. Now, whether this was due to incompetence, inexperience, or miscommunication, the end result remains. Bellowen to trial was severely conflicted in ethically challenged representation. I'd also just briefly like to point out the disparities between Bell and Reyes. Bell's the boss, Reyes is the subordinate. This hierarchy was disregarded. Then you've got the compacted timeframe. The switch in clients is made within hours of meetings and just hours before trial. And these were two defendants, two co-defendants with antagonistic or at least conflicting positions. Bell could blame Reyes and vice versa. I see I'm out of my time, but again, I would just stress that the uniqueness and rarity of this situation compels reversal. Thank you, Your Honors. Thank you very much, Mr. Kelleher, and we appreciate your willingness to accept the appointment in this case. It's of great help to the court as well as to your client. Thanks to all parties. We will take the case under advisement.